1

2

3

4

5              UNITED STATES DISTRICT COURT

6              NORTHERN DISTRICT OF CALIFORNIA

7

8    JAMES M. V. AMADEO,                          No. C 06-5999 MHP (pr)

9              Plaintiff,                          **ORDER GRANTING SUMMARY**
                                                   **JUDGMENT FOR DEFENDANTS**
10         v.

11   JOHN DAVEY; et al.,

12         Defendants.
                                              /
13

14                              **INTRODUCTION**

15         In this <u>pro se</u> prisoner's civil rights action under 42 U.S.C. § 1983, James Amadeo

16   complains that prison officials violated his rights to free speech and due process when they

17   decided to retain him in the prison's security housing unit ("SHU") for repeated misconduct

18   and his display of a tattoo that stated "cop killer."  He disputes that he displayed his tattoo in

19   a boastful manner and disputes that the tattoo had any connection to his murder of a juvenile

20   hall officer, but has no evidence to contradict the evidence that one of the defendants

21   received a report from another correctional officer that Amadeo was boastfully displaying his

22   tattoo.  Prison officials interpreted Amadeo's boastful display of his "cop killer" tattoo to be

23   an effort to promote himself as a leader in a skinhead gang, and considered that to be a risk to

24   prison security.  Prison officials decided to keep Amadeo in the SHU after determining that

25   he posed a threat to prison safety based on his disciplinary history, the tattoo evidence, and

26   other circumstances.

27         The matter is now before the court for consideration of cross-motions for summary

28   judgment and miscellaneous motions filed by plaintiff.  For the reasons discussed below,

**United States District Court**
For the Northern District of California

defendant prison officials are entitled to judgment as a matter of law on the claims pertaining to their decision to retain Amadeo in the SHU because neither the First nor the Fourteenth Amendment precluded prison officials from using information about the tattoo.

## BACKGROUND

The following facts are undisputed unless otherwise noted:

The incidents that gave rise to the complaint occurred in November 2005 at Pelican Bay State Prison.

James Amadeo was serving a sentence of life without the possibility of parole for a 1997 conviction of first degree murder with special circumstances.  The conviction stemmed from an incident during which Amadeo murdered a juvenile hall officer during an escape attempt.  Amadeo had many tattoos on his body, including one that read "Mother fucken' cop killer" and stretched across his chest from shoulder to shoulder.  Although he has other tattoos -- including a swastika and a clenched fist on his torso, the phrase "pure hate" on his calves, and the word "skinhead" tattooed from shoulder to shoulder across his back -- the "cop killer" tattoo is the one of interest here.  See Akin Decl., Exhs. B-D.

Defendants William Barlow, L. Williams, and M. Castellaw were employed by the California Department of Corrections & Rehabilitation ("CDCR").  Barlow, Williams, and Castellaw were the members of the Institution Classification Committee ("ICC") that determined on November 23, 2005 that Amadeo would remain in administrative segregation ("ad-seg").  Barlow served as an acting correctional counselor II, Williams was a facility captain, and Castellaw was the chief deputy warden at Pelican Bay.

A.    Placement And Retention Of Disruptive Inmates In The SHU

A state regulation provides that "[a]n inmate whose conduct endangers the safety of others or the security of the institution shall be housed in a SHU." 15 Cal. Code Regs. tit. 15, § 3341.5(c).  Placement may be for a specified term or on an indeterminate basis.  Id.  The regulation describes the criteria for assignment to the SHU: "The inmate has been found guilty of an offense for which a determinate term of confinement has been assessed or is deemed to be a threat to the safety of others or the security of the institution." Id. §

2

United States District Court
For the Northern District of California

3341.5(c)(1). Another part of that same regulation provides the following about release from the SHU for an inmate approaching his minimum eligible release date ("MERD") on a determinate term in the SHU:

> An inmate shall not be retained in SHU beyond the expiration of a determinate term or beyond 11 months, unless the classification committee has determined before such time that continuance in the SHU is required for one of the following reasons:
>
> (A) the inmate has an unexpired MERD from SHU.
>
> (B) Release of the inmate would severely endanger the lives of inmates or staff, the security of the institution, or the integrity of an investigation into suspected criminal activity or serious misconduct.
>
> (C) The inmate has voluntarily requested continued retention in segregation.

15 Cal. Code Regs. § 3341.5(c)(3).[1]

An August 26, 2002 CDCR memorandum suggested that prison officials consider indeterminate SHU terms for certain recidivist disruptive inmates. The memorandum was intended to provide direction to institution staff "relevant to the review and program consideration of inmates who complete a Determinate Security Housing Unit (SHU) term and continue to pose a threat to the safety of others or security of the institution" due to his behavior while in the SHU or due to his disciplinary history. Barlow Decl. Exh. C. The disruptive inmate memorandum stated:

> Effective immediately, during the pre-Mimnimum Eligible Release Date review, classification staff shall consider Indeterminate SHU status for inmates who have demonstrated the desire to be disruptive and endanger the safety of others or the security of the institution. The following are examples of inmates who may qualify for consideration of Indeterminate SHU status:
>
> 1.    Inmates currently serving a Determinate SHU term whose in-custody behavior reflects a propensity towards disruptive conduct, regardless of whether the inmate is not eligible for additional Determinate SHU term assessment.
>
> 2.    Specifically, inmates who have been assessed three Determinate SHU terms for any offense or assessed two Determinate SHU terms for participation in a riot, melee, or disturbance.

Id..

B.    Amadeo's Disciplinary History

Amadeo had been in the CDCR system since 1997. During that time, he received at least four serious rule violation reports (also known as CDC-115s).

Disciplinary # 1 - Conspiracy To Commit Assaults On Inmates: Amadeo received a CDC-115 charging him with battery on an inmate on March 28, 1998, and eventually was found guilty of conspiracy to commit assaults on other inmates. Amadeo Decl., Exh. EE. That CDC-115 included a finding that three separate confidential sources identified Amadeo "as associating with the disruptive group known as 'Skinheads'; being in possession of a weapon for the purpose of assaulting another white inmate; being present with other Skinheads when an inmate was ordered to assault inmates or get off the yard." Id. He received a three-month SHU term for this offense.

Several confidential information disclosure forms from the 1998 disciplinary proceeding stated that prison officials had received confidential information about Amadeo's activities with respect to influencing other inmates. These forms disclosed that prison officials received confidential information from various sources indicating: "Amadeo is ordering inmates 'off the yard' and that failure to do so would result in great bodily injury and that the order came from the Nazi Low Riders;" "Amadeo is threatening other inmates with great bodily injury by order of the Nazi Low Riders;" "Amadeo was in possession of a weapon and had been ordered by the Nazi Low Riders to assault another inmate;" "Amadeo is identified as the inmate that is suppose[d] to assault another white inmate;" and "Amadeo is ordering inmates to assault other inmates if they want to stay on the yard without trouble." Amadeo Decl., Exh. EE (3/31/98 confidential disclosure forms). The CDC-115 decision for the March 28, 1998 incident identified the group as the "skinheads," whereas the original CDC-115 charge and the disclosure forms identified the group as the "Nazi Low Riders." See Amadeo Decl., Exh. EE. There is no evidence that Amadeo challenged the discrepancy (i.e., Nazi Low Riders vs. Skinheads) back in 1998.

Disciplinary # 2 - Accomplice To Battery On An Inmate With A Weapon: Amadeo received a CDC-115 for an incident on May 15, 2000 for being an accomplice in the battery on an inmate with a weapon. Tama Decl., Exh. F. The incident was described as four white inmates attacking another inmate on the yard; one inmate slashed the victim's face while Amadeo and others hit the victim with their fists. Amadeo received a 6-month SHU term for

this offense.

Disciplinary # 3 - Battery On An Inmate With A Weapon: Amadeo received a CDC-115 for battery on an inmate with a weapon on March 3, 2002.  Tama Decl., Exh. H.  The incident report stated that Amadeo and another inmate "slashed, and attempted to stab" a third inmate on the yard.  Two weapons were recovered: one appeared to be two toothbrushes secured together to hold a razor blade and the other was a rod with a melted plastic handle. For this offense, Amadeo received a 24-month SHU term.

Disciplinary # 4 - Possession Of A Weapon: Amadeo received a CDC-115 for possession of a weapon on July 24, 2002.  Tama Decl., Exh. J.  This weapon reportedly was about 2" long and 1" in diameter and was made of four razor blades melted into the end of a piece of plastic.  Amadeo admitted that the weapon was his.  For this offense, Amadeo received a 15-month SHU term.

Amadeo's first few years in the SHU were spent serving determinate terms imposed for the foregoing disciplinary offenses.  Amadeo was transferred from High Desert State Prison to Pelican Bay on November 26, 2002 to serve his SHU terms.  His case was reviewed several times without incident and his minimum eligible release date ("MERD") from the SHU remained at February 11, 2005.  On January 13, 2004, Amadeo received a 45-day SHU time credit forfeiture for misconduct, which extended his MERD to March 26, 2005.  (He called the incident that led to the credit forfeiture "horseplaying," while prison officials called it "mutual combat."  Compare Complaint, p. 23 with Complaint Exhs. at 10 and Amadeo Decl., Exh. X (5/17/03 CDC-115 states that Amadeo and his cellmate were seen "striking each other in the upper body and facial area with their fist[s]," fell to the floor and began grappling with each other, refused commands to stop fighting, and were pepper sprayed.))

C.    Amadeo's Indeterminate Retention In SHU

A pre-MERD hearing was held on January 5, 2005, at which time Amadeo was informed he would not be released to the general population but would instead be retained in the SHU on indeterminate status.  He was kept in the SHU pursuant to the disruptive inmate

memo because he had four SHU terms in four years for weapons and assault charges. Amadeo disagreed that he qualified and disagreed that indeterminate status was permitted on this ground.  Amadeo was told that his indeterminate placement would be reviewed in 180 days and he would be considered for release to the general population if he maintained exemplary behavior.  <u>See</u> Tama Decl., Exh. L (1/5/05 ICC decision states "Committee told S that at his 180-Day Review in July, he would be considered for GP release, assuming his behavior has been exemplary.")

Amadeo had a 180-day review on June 21, 2005.  Despite his assertion that he had been an exemplary inmate and promised to behave himself if released to general population, the committee refused to release him from his indeterminate SHU placement.

1.     The November 23, 2005 ICC Hearing

On November 18, 2005, prison officials served Amadeo with a copy of the CDC-114D administrative segregation unit placement notice.  Tama Decl., Exh. O.  The form stated that the reasons for placement were that the inmate "presents an immediate threat to the safety of self or others" and "endangers institution security."  <u>Id.</u> Part A.  The description of the circumstances for the placement stated: "You are currently being retained in SHU on an indeterminate status due to receiving four prior SHU terms.  Based upon the aforementioned, you are deemed to represent a threat to the safety of the institution and others.  You are scheduled to appear before ICC for your annual 114d review, at which time ICC will review and evaluate your case factors to determine your future housing needs.  You will be afforded the opportunity to present any relevant information to this Committee regarding your current housing and or program."  <u>Id.</u>

On November 23, 2005, the annual or 180-day review occurred.  Minutes before the hearing, a correctional counselor told Amadeo he would be recommended for release to general population and asked if he could "get along" in the general population.  At the hearing, however, hearing officer Barlow stated that it had been brought to his attention that Amadeo had a "cop killer" tattoo.  Complaint, p. 31.  Amadeo asserted that his tattoos had nothing to do with his past disciplinary history or his continued retention in the SHU.

United States District Court
For the Northern District of California

1   Hearing officer Barlow responded that Amadeo's "tattoo was 'inflammatory,' and as such was

2   'very much my business,' especially when plaintiff was known to 'strut around the unit

3   without a shirt on.'" Id. at 31-32; see Barlow Decl., ¶¶ 3-4.  Amadeo denied that he strutted

4   around the unit and said that the only time he allowed his tattoo to be viewed was during

5   mandatory strip searches and otherwise kept it to himself.  Amadeo asked which officer had

6   provided this information so he could rebut it, but Barlow insisted it did not matter who

7   provided the information as long as Amadeo had the tattoo.  Amadeo protested he had not

8   been given prior warning or notice so he could defend himself against this new accusation.

9   The ICC (comprised of defendants Castellaw, Williams and Barlow) decided to extend

10  Amadeo's indeterminate SHU term.  The memo written after the ICC review stated:

11        Committee notes S is currently serving a SHU INDET term due to S's disciplinary
          history.  Based on the behavior which resulted in S receiving this SHU term, he is
12        determined to pose a threat to the safety of others and institution security, therefore
          requiring segregation from the GP.  Committee notes that S has four prior SHU terms:
13        7/14/02- Possession of a Weapon; 03/03/02- Assault on an Inmate W/ Weapon;
          5/15/00- Assault on an Inmate; and 03/28/98- Conspiracy to Commit Battery.  ICC
14        reviewed and discussed S's disciplinary history, which includes a propensity for
          violence in numerous assaults and weapon possessions, documented leadership role in
15        previous assaults (RVR's dated 03/28/98, 05/15/00, 03/03/02), a tattoo on S's chest
          reading "CopKiller." This tattoo, by S's self-admission, stems from his commitment
16        offense of Murdering his Juvenile Hall Officer.  ICC considers this tattoo
          inflammatory and used it as a factor in the decision.  S admitted to receiving that
17        tattoo shortly after being received into CDCR.  S's disciplinary history indicates he
          was in a leadership role shortly after arriving in prison, which is considered unusual
18        due to S's young age at commitment.  Staff officers have advised the administration
          that S has gone to the yard and shower in an uncovered manner that would display the
19        tattoo.  The notoriety of the commitment offense and the display of the tattoo,
          "CopKiller," may serve to provide S with some influence over other inmates.
20        COMMITTEE ACTS, THEREFORE, TO retain S in SHU on Indeterminate status
          and refer to CSR with recommendation for PBSP SHU based on his disruptive
21        behavior.

22  Tama Decl., Exh. P.

23        2.   The "Cop Killer" Tattoo

24        It is undisputed that Amadeo has a tattoo on his chest from shoulder to shoulder that

25  says "Mother fucken' cop killer."  Amadeo received this tattoo about nine years ago.

26  Complaint, p. 33.  Also about nine years ago, Amadeo was convicted of the murder of a

27  juvenile hall officer during an attempted escape.  Amadeo denies that he has ever "killed a

28  cop."  Complaint, p. 33.  Amadeo asserts that the "inspiration for this tattoo arose from the

title/lyrics of a popular heavy-metal song from the early 1990s." Complaint, p. 33.

Amadeo denies here (as he did at the ICC hearing) that he has been showing off his tattoo or strutting around in such a way as to show it off. He does concede that his "tattoo has been seen by almost every correctional officer in the C.D.C.R. who has ever strip-searched" him and has been seen by some inmates, as it is visible when he is in the shower or in his cell exercising. Amadeo Decl., Exh. A.

In their summary judgment moving papers, defendants provide further information about the context for prison officials' concern about the "cop killer" tattoo. Defendant Barlow had reviewed Amadeo's case file (including information about his commitment offense, disciplinary history, and confidential information regarding his involvement in the United Society of Aryan Skinheads (USA Skins). Barlow Decl., ¶ 3. Barlow had been informed by an officer in Amadeo's housing unit that he had the "cop killer" tattoo.

> This unit officer further relayed to me that inmate Amadeo displayed this tattoo by walking around without a shirt on as he went to the showers and to yard. This information, combined with information I had read in inmate Amadeo's confidential portion of his central file, concerned me because it was apparent that inmate Amadeo was earning an increasing leadership role within the USA Skins, and may have been relying on his tattoo and commitment offense to bolster his credibility, which in turn appeared to increase his influence among his inmate-peers. Inmate Amadeo's growing leadership role was evidenced by his participation in previous assaults on other inmates. Further, documents in the confidential portion of his central file indicated that inmate Amadeo also instructed inmates to attack certain other inmates–a fact that demonstrated his leadership role in his prison disruptive group. In my experience, it was highly unusual for a young inmate like Amadeo to have such an influential role in a prison setting.

> Because inmate Amadeo was using his tattoo to gain favor with the USA Skins and influence other inmates, he was becoming increasingly dangerous in his disruptive group activities. I was therefore obligated to raise my concerns regarding his tattoo during his November 23, 2005 ICC hearing. It was important for the other staff members present at inmate Amadeo's ICC hearing to become aware of the danger that inmate Amadeo posed beyond that which was evident from his disciplinary history. Due to the notoriety of his commitment offense and the fact that inmate Amadeo took steps to purposely display his "Cop Killer" tattoo, the other ICC members agreed that inmate Amadeo was using his tattoo to gain influence over other inmates. This posed a serious threat to the safety of other inmates and to the security of the institution.

Barlow Decl., ¶¶ 4-5. The display of the tattoo was not the only factor the ICC took into account in determining whether to keep Amadeo in the SHU: the committee also "looked heavily upon inmate Amadeo's disciplinary history" that the committee believed indicated a

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

propensity for violence. Id. at ¶¶ 7-8. Barlow also noted that the four prior SHU terms alone would have been sufficient to hold him in the SHU indeterminately consistent with the August 26, 2002 disruptive inmate memorandum. Id. at ¶ 9-10. Barlow declared that he had described the tattoo as inflammatory not because it inflamed prison staff, but because Amadeo was displaying it to inflame and influence other inmates. Id. at ¶ 12.

Defendants also presented evidence from prison gang expert Devan Hawkes about the tattoo, the USA Skins disruptive group, and Amadeo's influence in that group. Hawkes explained that a "disruptive group" is defined in the regulations as a gang other than a prison gang. See 15 Cal. Code Regs. § 3000 (defining, inter alia, "disruptive group" and "gang" and "prison gang").

> The USA Skins is a group of skinheads whose purpose is to unite members of the "Aryan Race" and battle their "enemies" who include non-white immigrants and Jews.
>
> A conviction for murdering a peace officer may bring an inmate notoriety and respect among certain inmates who espouse similar beliefs. To some inmates, law enforcement officials are considered enemies, and therefore someone who kills a member of law enforcement is revered. To the best of my knowledge, not all inmates feel this way, but many do. Because inmate Amadeo has a tattoo across his chest indicating that he is a "Cop Killer," other inmates may be influenced by his commitment offense. By tattooing "Cop Killer" across his chest, inmate Amadeo is attempting to convey a specific message to those inmates who share similar beliefs to gain influence among the inmate population. That would earn him status among like-minded inmates.

Hawkes Decl., ¶¶ 4-5. Hawkes opined that Amadeo's tattoo presented a risk to the safety of other inmates, staff and to the security of the institution because it may influence other inmates who believe that law enforcement is the enemy and he might use this influence to persuade other inmates to engage in criminal conduct such as attacks on other inmates or staff. Hawkes Decl., ¶ 7. Hawkes also opined that Amadeo's disciplinary history "indicates a propensity for violence and evidences the serious risk that he poses to the general inmate population." Id. at ¶ 8.

D.   Amadeo's Eventual Release From The SHU

Amadeo had another 180-day review on May 9, 2006. At that time, a committee (made up of new members) determined to retain him in the SHU on indeterminate status "due to disciplinary history." Complaint Exhs. at 46. The committee did not rely on the tattoo or

**United States District Court**
For the Northern District of California

Amadeo's display of his tattoo.   There is no mention of the tattoo or Amadeo's display of it in the May 9, 2006 decision to retain him in the SHU.

Amadeo was eventually released from the SHU.  On October 11, 2006, an ICC recommended that he be transferred to the general population yard, noting that he had been disciplinary free for 3 years and 5 months.  On December 20, 2006, Amadeo went before a different ICC which referred him to the behavior management unit program in the general population.[2]  On April 10, 2007, a committee released him to general population.

On June 8, 2007, Amadeo was returned to ad-seg pending an investigation "into fomenting violence and creating racial tension."  The CDC-114 for the incident stated, "you are believed to be responsible for racial unrest and the fomentation of violence from within and among the Facility B General Population.  While being ordered to move from your cell, you Willfully Resisted, Delayed and otherwise Obstructed Peace Officers in the performance of their duties, requiring immediate Use of Force upon yourself to facilitate the move."  Amadeo Decl., Exh. BB.  He states that he was released from ad-seg on October 17, 2007 without charges.   He was put back into ad-seg two days later (on October 19, 2007) pending a different investigation.  The October 19, 2007 CDC-114 stated that he was being put in ad-seg "pending an investigation into your suspected association / membership and activity with the prison gang, Nazi Low Rider (NLR)."  Amadeo Decl., Exh. T.

The "cop killer" tattoo has not been mentioned since the November 23, 2005 ICC hearing, according to Amadeo.

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to the claims occurred at Pelican Bay in Del Norte County, within the Northern District.  This court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.") The moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324 (citations omitted.) The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party.  See id. at 631.

On issues as to which the moving party bears the burden of proof at trial -- such as the qualified immunity defense in this case -- he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial.  See Houghton v. Smith, 965 F.2d 1532, 1536 (9th Cir. 1992).  He must establish the absence of a genuine issue of fact on each issue material to his affirmative defense.  Id. at 1537.  Once the moving party has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence.  See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity

1   with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and

2   correct, and allegations were not based purely on his belief but on his personal knowledge).

3   The complaint was signed under penalty of perjury and therefore may be considered in

4   deciding the motion for summary judgment.

**DISCUSSION**

A.      Defendants' Motion For Summary Judgment

        1.      Due Process Claim

        The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution

protects individuals against governmental deprivations of life, liberty or property without due

process of law.  Changes in conditions of confinement for a prison inmate may amount to a

deprivation of a constitutionally protected liberty interest, provided that the liberty interest in

question is one of real substance.  Sandin v. Conner, 515 U.S. 472, 477-87 (1995).  For

purposes of this motion, the court assumes that indefinite placement in the SHU implicated a

liberty interest of real substance.

        When prison officials initially determine whether a prisoner is to be segregated for

administrative reasons and a liberty interest of real substance is implicated, due process

requires that they hold an informal nonadversary hearing within a reasonable time after the

prisoner is segregated, inform the prisoner of the charges against him or the reasons

segregation is being considered, and allow the prisoner to present his views.  Toussaint v.

McCarthy, 801 F.2d 1080, 1100 (9th Cir. 1986), cert. denied, 481 U.S. 1069 (1987).  Due

process also requires that there be an evidentiary basis for the prison officials' decision to

place an inmate in segregation for administrative reasons.  Superintendent v. Hill, 472 U.S.

445, 455 (1985); Toussaint, 801 F.2d at 1104-05.  There must be "some evidence" from

which the conclusion of the administrative tribunal could be deduced.  Superintendent v.

Hill, 472 U.S. at 455; Toussaint, 801 F.2d at 1105.  The evidence relied upon must have

"some indicia of reliability" to satisfy due process requirements.  See also Toussaint v.

McCarthy, 926 F.2d 800, 803 (9th Cir. 1990), cert. denied, 502 U.S. 874 (1991) (considering

accuracy of polygraph results when used as evidence to support placement in administrative

United States District Court

For the Northern District of California

1  segregation); <u>Cato v. Rushen</u>, 824 F.2d 703, 705 (9th Cir. 1987) (evidence relied upon by a

2  prison disciplinary board must have "some indicia of reliability").

3         Prison officials must also engage in some sort of periodic review of an inmate's

4  confinement in ad-seg, <u>Hewitt v. Helms</u>, 459 U.S. 460, 477 n.9 (1983); <u>Toussaint</u>, 801 F.2d

5  at 1101, which must amount to more than "meaningless gestures." <u>Toussaint v. Rowland</u>,

6  711 F. Supp. 536, 540 n.11 (N.D. Cal. 1989) (citing <u>Toussaint v. McCarthy</u>, 801 F.2d at

7  1102). Amadeo's claims concern one of these periodic reviews.

8         Amadeo received advance written notice of the November 2005 periodic review about

9  five days before the hearing. The notice informed him of the reasons for the contemplated

10  continued retention in ad-seg in the SHU: the inmate "presents an immediate threat to the

11  safety of self or others" and "endangers institution security." Tama Decl., Exh. O. The

12  notice also described the circumstances for the placement and stated that he was currently

13  being retained in the SHU on an indeterminate status due to receiving four prior SHU terms.

14         Amadeo argues that he was entitled to notice that prison officials contemplated using

15  the tattoo evidence in their decision-making. Due process did not require notice of the

16  evidence that might be considered – in fact, it apparently did not even require advance notice

17  of the periodic review hearing. <u>Compare</u> <u>Wolff v. McDonnell</u>, 418 U.S. 539, 564 (1974)

18  (written notice required for disciplinary decisions) <u>with</u> <u>Toussaint</u>, 801 F.2d at 1100-01 (not

19  mentioning any need for advance notice of the reasons for ad-seg placement, although the

20  inmate must be informed of those reasons). The failure to inform Amadeo before the hearing

21  that his display of his tattoo might be considered at the hearing did not violate any due

22  process right.

23         Amadeo was provided an opportunity to be heard at the November 23, 2005 review.

24  He protested the use of the tattoo and its relevance. He also expressed his desire to go to the

25  yard and program.

26         There was more than some evidence to support the decision to retain Amadeo in ad-

27  seg. The CDCR's disruptive inmate memorandum suggested that prison officials consider

28  putting inmates who were recidivist disciplinary problems into ad-seg. Amadeo fit the bill.

13

United States District Court
For the Northern District of California

1   He had received four CDC-115s for weapons and violence and had received four SHU terms.

2   Those CDC-115s reasonably could be seen as indicating a pattern of violence, aggression

3   and criminal conduct, as they showed Amadeo had possessed a weapon with razor blades on

4   one occasion, had used either a slashing or stabbing weapon to attack an inmate on another

5   occasion, had been in a conspiracy to assault inmates on yet another occasion, and had taken

6   part in a group attack on an inmate on a fourth occasion.  His disciplinary history alone

7   provided some evidence to support the decision to retain him in ad-seg because he "pose[d] a

8   threat to the safety of others and institution security, therefore requiring segregation" from

9   the general population.  Tama Decl., Exh. P.  Even if all the other information the ICC used

10  was set aside, those four SHU terms provided some evidence to support prison officials'

11  determination that he presented a threat to safety and institutional security.

12      Amadeo argues that his tattoo is not subject to the <u>Superintendent v. Hill</u> some

13  evidence standard, incorrectly assuming that if the tattooed words were covered by the First

14  Amendment, they could not be used for any evidentiary purpose.  "[T]he First and Fourteenth

15  Amendment have never been thought to give absolute protection to every individual to speak

16  whenever and wherever he pleases or to use any form of address in any circumstances that he

17  chooses." <u>Cohen v. California</u>, 403 U.S. 15, 19 (1971); <u>Dawson v. Delaware</u>, 503 U.S. 159,

18  164 (1992) (rejecting argument that the Constitution forbids consideration in sentencing of

19  any evidence concerning beliefs or activities that are protected under the First Amendment);

20  <u>see also</u> <u>Street v. New York</u>, 394 U.S. 576, 594 (1969) (First Amendment is not violated by

21  use of speech as evidence to establish an element of an offense that otherwise passes

22  constitutional muster).  Examples abound of speech being used as evidence in criminal and

23  civil cases; e.g., a bank robber's statement to a bank teller, a drug purchaser's request to buy

24  drugs, and a promisor's renunciation of his contractual obligations.  Amadeo fails to establish

25  that his words were exempt from consideration by prison officials in evaluating him.

26      Amadeo next urges that there was no evidence that his tattoo was related to his

27  disciplinary history or would incite violence or allow him to incite violence.  Opposition, p.

28  17.  Prison officials did not claim to have any physical evidence of that connection and

United States District Court
For the Northern District of California

instead drew an inference from Amadeo's manner of display of the tattoo in light of the other information they had available to them.  "In assessing the seriousness of a threat to institutional security prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners inter se, and the like.  In the volatile atmosphere of a prison, an inmate may easily constitute an unacceptable threat even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents." Hewitt, 459 U.S. at 474; see also id. at 477 n.9.  The disciplinary history, the information about some of the disciplinary offenses that suggested Amadeo was a leader in prison misconduct at an unusually young age, the "cop killer" tattoo that was thought to be related to his murder of a juvenile hall officer, and the report of his boastful display of his "cop killer" tattoo all added up to a strong case that Amadeo posed a threat if released to general population as it suggested that Amadeo's misbehavior was related to his affiliation with a gang.

Amadeo also urges that retention in the SHU due to his disciplinary history could last only one year.  His declaration relays prison scuttlebutt that inmates are usually let out after a year in the SHU.  This hearsay is not admissible evidence and does not create a triable issue of fact.  His assertion that there was a one-year limit fails to persuade for numerous reasons.  The dictionary definition of "indeterminate" is not "one year."  The regulation does not limit indeterminate placement to one year. See 15 Cal. Code Regs. § 3341.5(c)   The disruptive inmate memorandum suggested indeterminate placement.  The CDC-114 issued to him contemplated indeterminate retention.  The memoranda written after his periodic reviews did not place a one-year limit on the placement.  Under the regulation, an inmate could be kept in the SHU indefinitely, subject to periodic review, as long as he was a threat to security.  There was some suggestion that such an inmate could earn his way out of the SHU with good behavior, but there were no explicit criteria or mandatory requirements for prison officials to release him so long as he met the criteria for ad-seg placement.  Amadeo fails to raise a

triable issue of fact that an indeterminate term actually meant a one-year term.  Furthermore, the math does not work for him because, even if he could establish that the usual ad-seg indeterminate term was one year, his indeterminate placement had only begun eight months earlier, on March 26, 2005.

Defendants presented evidence that Amadeo received the necessary procedural protections when his ad-seg placement was reviewed at the November 23, 2005 hearing and there was some evidence to support the decision to retain him in ad-seg at that time.  Amadeo has not met his burden of producing evidence from which the inference could be drawn that the periodic review was meaningless or that there was not some evidence to support the decision.  Defendants are entitled to judgment as a matter of law on the due process claim.

2.      First Amendment Challenge

The parties do not dispute that the "cop killer" tattoo was speech.  This is not to say that all tattoos are speech, but this particular one was, as it was a written phrase not materially different from displaying a sign with the same words printed on it.  Cf. Morse v. Fredericks, 127 S. Ct. 2618 (2007) (evaluating First Amendment protection for student waiving "Bong Hits 4 Jesus" banner viewed as promoting illegal drug use); Cohen v. California, 403 U.S. 15 (1971) (evaluating First Amendment implications of jacket bearing the words "Fuck the Draft").  The court rejects defendants' contention that the "cop killer" tattoo amounted to fighting words for which there was no First Amendment protection.  The tattoo's wording did not by its mere existence inflict injury or tend to incite an immediate breach of the peace.  See Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942); United States v. Poocha, 259 F.3d 1077, 1080-81 (9th Cir. 2001).  Although the non-prison cases are important to the consideration of whether the tattoo was speech and whether it amounted to fighting words, the usefulness of the non-prison First Amendment cases largely ends there because Turner v. Safley, discussed infra, sets the standard for evaluation of prisoners' First Amendment claims.

The court and prison officials are not required to accept the meaning Amadeo ascribes to the tattoo.  He urges that it was a nod to a heavy metal song, while prison officials saw it

16

United States District Court
For the Northern District of California

as a reference to his killing of a juvenile hall officer.  The situation thus is like that in <u>Morse v. Fredericks</u>, 127 S. Ct. at 2625, where the court at the summary judgment stage was not constrained to accept a plaintiff-student's statement that his "Bong Hits 4 Jesus" banner was "meaningless and funny" and instead analyzed it accepting the school principal's interpretation that it was a pro-drug use message.  Prison officials are no more obliged to believe Amadeo's assertion that his "cop killer" tattoo is a heavy metal salute than they'd be obliged to believe that Amadeo's swastika tattoo is just a geometric pattern or that his "skinheads" tattoo is just an homage to male pattern baldness.  Their belief that the tattoo obtained about nine years ago was related to Amadeo's murder of a juvenile hall officer also about nine years ago was objectively reasonable.  Amadeo's disagreement with prison officials' interpretation of the meaning of the tattoo does not preclude summary judgment, just as the disagreement as to the meaning of the banner did not preclude summary judgment in <u>Morse v. Fredericks</u>.  Further, although normally the court draws all justifiable inferences in the non-movant's favor at the summary judgment stage, in disputed matters of professional judgment, the court's inferences must accord deference to the views of prison authorities. <u>Beards v. Banks</u>, 548 U.S. 521, —, 126 S. Ct. 2572, 2578 (2006).

A prisoner possess only those First Amendment rights "that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." <u>Pell v. Procunier</u>, 417 U.S. 817, 822 (1974).  Strict scrutiny is inappropriate to test the infringement of prisoners' constitutional rights.  <u>Turner v. Safley</u>, 482 U.S. 78 (1987); <u>see Johnson v. California</u>, 543 U.S. 499, 530-31 (2005) (noting exception to <u>Turner</u> for race-based classifications).  In <u>Turner</u>, the Court reiterated the need for judicial deference to the problems of prison administration and identified the appropriate standard for judicial review of a regulation:  "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." <u>Turner</u>, 482 U.S. at 89.  The burden "is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." <u>Overton v. Bazzetta</u>, 539 U.S. 126, 132 (2003).  <u>Turner</u> identified four factors to guide the determination whether the regulation is reasonably related

1   to a legitimate penological interest.

2        The regulation applied to Amadeo, § 3341.5, does not even mention speech, but

3   simply allows for placement of dangerous inmates in the SHU.  Amadeo does not quibble

4   with prison officials' authority to put dangerous inmates in the SHU, but rather disagrees with

5   their determinations that the tattoo evidence could be used to and did show that he was one of

6   those dangerous inmates.  See Plaintiff's Memo. of Points & Auth. In Support of Plaintiff's

7   Motion Opposing Defendants' Motion For Summary Judgment, p. 13; Plaintiff's Reply, p. 6.

8   Amadeo makes an "as applied" challenge.  See Hargis v. Foster, 312 F.3d 404, 410 (9th Cir.

9   2002).  The court now tests prison officials' use of the "cop killer" tattoo evidence as one of

10  the bases to retain Amadeo in ad-seg under § 3341.5 using the Turner factors.[3]

11       The first factor to consider is whether there is a "'valid, rational connection' between

12  the prison regulation and the legitimate government interest put forward to justify it."

13  Turner, 482 U.S. at 89.  There is a legitimate government interest in ensuring the safety of

14  inmates and security of the institution, including protecting prisoners from violence at the

15  hands of other prisoners.  Farmer v. Brennan, 511 U.S. 825, 833 (1994).  Prison gangs in

16  particular are fundamentally incompatible with inmate and staff safety.  See, e.g., Wilkinson

17  v. Austin, 545 U.S. 209, 227 (2005); Westefer v. Snyder, 422 F.3d 570, 575 (7th Cir. 2005)

18  (prison gangs are a manifest threat to prison order and discipline; contention that prisoner has

19  a First Amendment right to belong to a gang fails to state a claim).  There was a valid,

20  rational connection between the safety and security interests and the regulation that permitted

21  the indeterminate retention of an inmate in the SHU if his release "would severely endanger

22  the lives of inmates or staff, [or] the security of the institution."  15 Cal. Code Regs. §

23  3341.5(c).  As applied to Amadeo, there was a valid, rational connection between the safety

24  and security interests and consideration of a tattoo that prison officials reasonably believed

25  was being displayed by Amadeo to promote his leadership role in a gang within the prison.

26  As one ICC member explained, the tattoo and related information concerned him because it

27  appeared that Amadeo was earning an increasing leadership role in a skinhead gang "and

28  may have been relying on his tattoo and commitment offense to bolster his credibility, which

in turn appeared to increase his influence among his inmate-peers."  Barlow Decl., ¶ 4.

Defendants also have provided the Hawkes declaration elaborating on Amadeo's connection

to a skinhead gang and the significance of his display of his "cop killer" tattoo in light of his

commitment offense.  Considering evidence (even if it was speech) probative of an inmate's

connection to a gang was reasonably related to the safety and security interest.

The second factor identified by <u>Turner</u> to determine the reasonableness of a restriction

"is whether there are alternative means of exercising the right that remain open to the prison

inmates." <u>Turner</u>, 482 U.S. at 90.   If so, the court should be particularly conscious of the

measure of judicial deference owed to corrections officials. <u>Id.</u>  Alternative means of

exercising the First Amendment right remain open to Amadeo.  Plaintiff can write, speak and

display words that do not promote himself as a gang leader or boast about his commitment

offense. <u>See, e.g.,</u> <u>Stefanow v. McFadden</u>, 103 F.3d 1466, 1474 (9th Cir. 1996) (even though

prisoner banned from reading particular publication, alternative means of exercising First

Amendment rights remain available where access to material which does not violate prison

security policy unaffected).  Amadeo's assertion that his tattoo is unremovable is beside the

point because defendants do not have to supply a solution for him and he apparently is free to

keep the tattoo, but simply not to walk around or exercise shirtless.  (In fact, this all may be

moot because he writes that he does not want to express the "cop killer" message any longer.

<u>See</u> Plaintiff's Memo. of Points & Auth. In Support Of Plaintiff's Motion Opposing

Defendants' Motion For Summary Judgment, pp. 13-14.)

The third factor to be considered in determining the reasonableness of the regulation is

"the impact accommodation of the asserted constitutional right will have on guards and other

inmates, and on the allocation of prison resources generally." <u>Turner</u>, 489 U.S. at 90.

Allowing Amadeo to display his "cop killer" tattoo in a manner that is perceived to be an

effort to promote his leadership role in a gang would have a significant detrimental impact on

institutional resources and promote a less safe prison environment.

The fourth factor to be considered in determining the reasonableness of the regulation

is the existence of ready alternatives:  "the absence of ready alternatives is evidence of the

reasonableness of a prison regulation . . . [while] the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." <u>Turner</u>, 489 U.S. 90.  This is <u>not</u> a "least restrictive alternatives" test.  <u>Id.</u> Amadeo has not shown that there exist obvious, easy alternatives to the consideration of an inmate's speech as evidence in determining whether he is a threat to institutional security or segregating an inmate who is perceived to be promoting his gang leadership image.

The <u>Turner</u> factors all clearly favor defendants.  Their use of the tattoo evidence as one of the bases for their decision to retain Amadeo in ad-seg did not violate his First Amendment rights.  Defendants are entitled to judgment as a matter of law on this claim.

### 3.   Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court set forth a particular sequence of questions to be considered in determining whether qualified immunity exists.  The court must consider this threshold question:  "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" <u>Id.</u> at 201.  If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail.  <u>See id.</u>  If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. . . .  'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Id.</u> at 201-02 (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).

The first step under <u>Saucier</u> is to determine whether a constitutional violation was alleged.  As a matter of <u>pleading</u>, Amadeo's complaint sufficed to allege First and Fourteenth

United States District Court
For the Northern District of California

violations.  However, as shown in the section above, the evidence in the record does not establish a violation of either constitutional protection.  Defendants prevail on the first step of the Saucier analysis, so the court need not proceed to the second step of the Saucier analysis. Defendants are entitled to judgment as a matter of law on the qualified immunity defense.

B.      Plaintiff's Motions

In light of the granting of defendants' motion for summary judgment, Amadeo's motion for summary judgment is denied.  He cannot prevail when defendants are entitled to judgment in their favor.

Amadeo's motion to strike the defendants' declarations is DENIED.  He has not provided a legally sufficient justification to strike the declarations or any parts thereof. Amadeo's disagreement with the statements in the declarations and his belief that they are prejudicial to him do not provide cause to strike them.  Even if the declarations paint an unflattering picture of Amadeo, the statements about Amadeo's disciplinary history, tattoos, and gang-related activities do no more than defend against the claims Amadeo chose to pursue in court against the defendants.  Within his motion to strike, Amadeo also requests access to the confidential portion of his central file.  That request is denied.  Defendants have provided a declaration that disclosure of the confidential information would present a serious risk to inmate and staff safety and institutional security.  See Tama Decl. (docket # 53), Exh. A at ¶ 3; Zimmerlee v. Keeney, 831 F.2d 183, 188 (9th Cir. 1987), cert. denied, 487 U.S. 1207 (1988) (in considering safeguards, the court should remember 'the legitimate institutional needs of assuring the safety of inmates and prisoners' and avoid 'burdensome administrative requirements that might be susceptible to manipulation'"); Wolff, 418 U.S. at 568-69.  Defendants have not filed any confidential documents and the court has not considered any confidential information in evaluating the pending dispositive motions.

Amadeo's motion to file a 2-part memorandum of points and authorities in opposition to defendants' motion for summary judgment is GRANTED.  The court has read both parts of the memorandum of points and authorities, i.e., the documents at docket # 42 and # 43.

**CONCLUSION**

United States District Court
For the Northern District of California

Defendants' motion for summary judgment is GRANTED.  (Docket # 23.)  Plaintiff's motion for summary judgment is DENIED.  (Docket # 47).  Plaintiff's motion to strike is DENIED.  (Docket #39.)  Plaintiff's motion to file a 2-part memorandum of points and authorities is GRANTED.  (Docket # 40.)  Judgment will be entered in defendants' favor and against plaintiff.  The clerk shall close the file.

IT IS SO ORDERED.

Dated: June 12, 2008

_____
Marilyn Hall Patel
United States District Judge

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

# NOTES

1.      Amadeo argues for an interpretation of § 3341.5(c) that the court rejected in the Order Of Service And Partial Dismissal.  His disagreement with the court's interpretation of § 3341.5 does not show a genuine issue of fact.

2.      The memorandum documenting his placement in the behavior management unit ("BMU") described the BMU as a pilot program.  "The purpose of this program is to provide a systematic method to modify inmate negative behavior and to provide for inmates desiring to program, without violence or disruptive conduct, to do so: unaffected by the disruptive segment of the inmate population."  Amadeo Decl., Exh. R at 1/16/07 UCC memo.  As with ad-seg, good behavior was required from Amadeo to work himself out of the BMU.

3.      The parties devote some effort to discussing regulations that might apply to Amadeo's tattoo, but he was never disciplined for violating a regulation regarding tattoos or disrespect so any such claim is not ripe for review.  The regulation that was applied to him was § 3341.5(c), and that is the regulation to be tested here.